*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
May 21, 2020

Plaintiff-Appellee,

v

No. 343749
Wayne Circuit Court

DONRIKO RUEMONDO-EMAN GOOSBY,

LC No. 17-001522-04-FC

Defendant-Appellant.

Before: GADOLA, P.J., and STEPHENS and SHAPIRO, JJ.

PER CURIAM.

Following a jury trial, defendant was convicted of conspiracy to commit first-degree murder, MCL 750.157a; MCL 750.316(a), four counts of assault with intent to murder, MCL 750.83, felony arising from gang membership, MCL 750.411u, and five counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced defendant to concurrent prison terms of life with the possibility of parole for the conspiracy conviction, 36 to 60 years for one assault conviction, 18 to 60 years for the other three assault convictions, 10 to 20 years for the felony arising from gang membership, and concurrent two-year terms for each of the five felony-firearm counts, to be served consecutively to the other sentences. Defendant appeals by right, and we affirm.

## I. FACTS

This case arises from the shooting of five-year-old MC. In the early afternoon of February 20, 2016, the child was riding in an SUV with her parents and younger sister in the city of Detroit. While stopped at an intersection, their SUV was sideswiped by a white Jeep. The Jeep was occupied by members of the Band Gang, who were chasing members of a rival gang. MC's father, driving the family's SUV, followed the Jeep, which stopped at a house on Mark Twain Drive frequented by the Band Gang. When the SUV turned onto Mark Twain Drive, Band Gang members at the house fired numerous times at it. Video from cameras located on the exterior of the house shows Band Gang members firing at the SUV from the porch and the yard of the house. One of the bullets fired struck MC in the temple. MC's father testified that he got out of the SUV and yelled at the shooters to stop shooting at his family, then returned fire with his gun. He then

drove the family to a nearby hospital. The child was seriously injured; she was in a coma for one week, underwent two brain surgeries, endured a lengthy hospitalization, and at the time of trial continued to suffer the effects of the injury, including seizures.

Kenneth Hutton, the leader of the Band Gang, later testified pursuant to a plea agreement and identified defendant as one of the gang members shooting from the house on Mark Twain Drive during the incident. He testified that on that day, he and other Band Gang members spotted members of a rival gang at a shopping center. While driving a white Jeep, they chased the rival gang members at high-speed, eventually side-swiping the SUV in which MC was riding. When the SUV pursued the Jeep, Hutton assumed that the SUV was also being driven by rival gang members. Hutton called defendant and other Band Gang members who were at the Mark Twain Drive house, asking them to shoot at the SUV when it drove by. Cell phone records confirm that minutes before the shooting defendant called the driver of the white Jeep three times. Video from the home's cameras show defendant, as identified by Hutton, standing on the porch and appearing to talk on a phone held in one hand while holding a gun in his other hand.

Police investigating immediately after the shooting found an AK-47 pistol, also referred to as a micro Draco, on a couch in the Mark Twain Drive house and testified that the gun was still warm, indicating that it had been fired recently. Testing indicated that defendant's DNA was present on the trigger, grip, and stock of the gun, along with DNA from two other people. The officers found numerous shell casings on the lawn and porch of the house, many of which were consistent with the micro Draco. The shell fragments extracted from the victim were consistent with having been fired from the micro Draco, but could not conclusively be said to have been fired from the gun.

Defendant was later arrested and interviewed by police. The officer interviewing defendant testified that defendant expressed remorse that a child had been shot, that defendant said that he had received a call and pulled the trigger, and that he also said it was a "wrong place at the wrong time" situation.

Defendant was charged and tried before a jury. At trial, defendant's attorney argued that defendant did not fire the shots that hit the victim, and that those shots were instead fired minutes earlier from the white Jeep when the SUV pursued the Jeep. At the conclusion of trial, the jury was able to agree on one count only. The trial court declared a hung jury under MCR.2.514(C)(4) on the remaining counts, with a conviction only on the charge of carrying a dangerous weapon with unlawful intent, MCL 750.226.[1]

Defendant was appointed new counsel, and thereafter was retried before a new jury on the remaining charges. During the second trial, defense counsel argued that defendant was not guilty because he had fired the gun in self-defense, believing that he was under attack by rival gang members. At the conclusion of the second trial, the jury found defendant guilty on all charges.

---

[1] Defendant was sentenced on this conviction to three years' probation, with the first year to be served in jail.

Defendant moved for a new trial and for an evidentiary hearing, contending that he had not received effective assistance of counsel during his second trial. The trial court granted defendant's motion for an evidentiary hearing, but thereafter denied defendant's motion for a new trial, concluding that trial counsel had not been ineffective. Defendant now appeals.

## II. DISCUSSION

Defendant contends that he is entitled to a new trial because his trial counsel at the second trial provided ineffective assistance by arguing a theory of self-defense contrary to defendant's assertion that he did not fire the shots that hit the victim. Defendant further argues that trial counsel also was ineffective because he failed to argue the theory of defense that defendant wanted to assert, being that the victim was shot earlier by someone shooting from the white Jeep and not during the shooting at the house on Mark Twain Drive. We disagree that defense counsel was ineffective.

We review for an abuse of discretion the trial court's decision to deny a motion for new trial. *People v Rao*, 491 Mich 271, 279; 815 NW2d 105 (2012). A trial court abuses its discretion when it chooses an outcome outside the range of principled outcomes. *People v Sharpe*, 502 Mich 313, 324; 918 NW2d 504 (2018). Whether defense counsel was ineffective is a mixed question of law and fact; we review the trial court's findings of fact for clear error, while reviewing de novo questions of constitutional law. *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012). In doing so, we review de novo whether defense counsel's acts or omissions fell below an objective standard of reasonableness under prevailing professional norms, and whether the result of the proceedings would have been different absent the error. *People v McFarlane*, 325 Mich App 507, 527; 926 NW2d 339 (2018).

A defendant's right to counsel is guaranteed by the United States and Michigan Constitutions. US Const, Am VI; Const 1963, art 1, § 20. The right to counsel includes the right to the effective assistance of counsel. *People v Vaughn*, 491 Mich 642, 669; 821 NW2d 288 (2012). To establish a claim of ineffective assistance of counsel, a defendant must show "(1) that trial counsel's performance was objectively deficient, and (2) that the deficiencies prejudiced the defendant." *People v Randolph*, 502 Mich 1, 9; 917 NW2d 249 (2018). In this context, prejudice means "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*, quoting *Strickland v Washington*, 466 US 668, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984).

To demonstrate that defense counsel's performance was objectively unreasonable, the defendant must overcome the strong presumption that defense counsel's decisions were based upon a sound trial strategy. *People v Ackley*, 497 Mich 381, 388; 870 NW2d 858 (2015). A trial strategy is sound if it is developed together with an investigation supported by reasonable professional judgment in light of the circumstances of the case. *People v Grant*, 470 Mich 477, 486-487; 684 NW2d 686 (2004). We presume that defense counsel provided effective assistance, and defendant's burden to prove that counsel was ineffective is a heavy one. *People v Schrauben*, 314 Mich App 181, 190; 886 NW2d 173 (2016). Defense counsel is not ineffective merely because the chosen strategy did not work. *People v Matuszak*, 263 Mich App 42, 61; 687 NW2d 342 (2004).

Although defense counsel has a duty to prepare, investigate, and present all substantial defenses, being any defense that might have made a difference in the outcome of the trial, *People v Chapo*, 283 Mich App 360, 370; 770 NW2d 68 (2009), decisions about what defense to present and what arguments to make at trial are a matter of trial strategy. *People v Strickland*, 293 Mich App 393, 398; 810 NW2d 660 (2011). This Court will not second-guess counsel on matters of trial strategy, *People v Rosa*, 322 Mich App 726, 742; 913 NW2d 396 (2018), and a difference of opinion about trial strategy between a defendant and his or her attorney does not constitute ineffective assistance of counsel. *People v Stubli*, 163 Mich App 376, 381; 413 NW2d 804 (1987).

In this case, defendant contends that defense counsel at trial was ineffective because he presented a theory of self-defense. Defendant argues that by doing so, counsel in effect admitted that defendant committed the crime, and that this strategy was inconsistent with defendant's wishes. Defendant states that he wanted counsel to present a defense similar to the one presented in his first trial in which his first trial counsel argued that MC had been shot by someone firing from the white Jeep before the SUV arrived at Mark Twain Drive.

At the conclusion of the first trial, defense counsel Richard Glanda argued that the evidence did not demonstrate that defendant was one of the shooters because defendant's DNA could have been transferred to the gun at any time, the witness placing defendant at the Mark Twain Drive house (Hutton) was not credible, defendant denied that he was the person in the surveillance video, and hospital medical records referenced statements by the victim's mother that MC was shot while they were chasing the white Jeep. At the evidentiary hearing before the trial court on defendant's motion for new trial, defendant testified that during the second trial he argued with his new attorney, Evan Callanan, asserting that he did not want to present a self-defense theory and instead wanted to use the same defense that had been used at the first trial.

At the evidentiary hearing, attorney Callanan stated that before trial he discussed the case with attorney Glanda and read the transcripts from the first case.[2] Callanan explained that although the hospital's nursing notes state that MC's mother reported that MC was shot by someone shooting from another vehicle, MC's mother refuted that statement during the first trial. Callanan explained that by contrast, Hutton's testimony supported a self-defense theory because he testified that the gang members had been shooting to protect themselves from attack. Callanan recalled that he and defendant extensively discussed a self-defense strategy and the lack of support for a misidentification defense, and that defendant did not object to the self-defense theory given the evidence against him.

Callanan opined that it would have been poor strategy to assert that defendant was not present, particularly in light of surveillance video depicting defendant shooting from the porch, defendant's incriminating comments to the police, the presence of defendant's DNA on the gun, and Hutton's identification of defendant as a shooter, all of which incriminated defendant. He therefore concluded that defendant's best defense was a theory that defendant acted in self-defense because he believed that a rival gang was attacking. Callanan also explained that the argument

---

[2] The first trial resulted in a hung jury due to a lone juror who did not vote to convict.

that MC was shot from the Jeep during a car chase was only a defense to one of four assault charges against defendant.

The trial court found that Callanan's self-defense theory was based on the evidence at trial, specifically that the Band Gang members thought they were under attack. The trial court also found that Callanan was aware of conflicting statements about whether the child was shot by someone in the Jeep during the car chase and had discussed this evidence with defendant, but that substantial evidence supported the assessment that self-defense was defendant's strongest defense. The trial court also observed that there was overwhelming evidence that defendant was one of the shooters. The trial court therefore concluded that defendant had not demonstrated that Callanan's performance was deficient or that it prejudiced defendant.

On appeal, defendant argues that his trial counsel should have adopted the argument used in his first trial that MC was shot by someone in the white Jeep during the car chase. At the first trial, medical records were admitted into evidence indicating that MC's mother told hospital workers that the child had been shot by someone firing from the white Jeep. At both trials, however, MC's mother denied speaking with anyone at the hospital, explaining that her husband did the talking because she was in shock, and also that she is hearing-impaired and reads lips to communicate, and that the emergency situation may have interfered with precise communication. At both trials, MC's mother testified that her husband chased the white Jeep after it struck them, that they then lost sight of the Jeep, and that they were fired on when they turned onto Mark Twain Drive. She testified both times that no one shot from the moving Jeep. MC's father testified that the shooting began when he turned a corner and saw the white Jeep in a driveway, and denied that there were any shots fired from the white Jeep as they drove. Similarly, Hutton denied shooting at the SUV while it followed the Jeep.

In contrast, there was substantial evidence that defendant shot at the SUV from the porch of the Mark Twain Drive house. Hutton testified that he saw defendant shoot a gun at the vehicle. Surveillance video from the house recorded the shooting, and defendant was identified on the video by Hutton shooting a mini AK-47 pistol from the porch. Hutton further testified that the video depicts defendant wearing the same clothing during the shooting that he is wearing in a picture taken during a party the night before. The gun that was recovered at the home still had a warm barrel, and the ejection marks from the shell casings around the porch matched the ejection marks of the gun. Defendant's DNA was on the trigger of the gun. Defendant also made incriminating statements to the police. Thus, the evidence overwhelmingly indicates that defendant shot at the SUV. Trial counsel's strategy to argue that the shooting was in self-defense, rather than arguing that defendant was not involved, was reasonable given the evidence.

Defendant contends, however, that regardless of the validity of the defense raised by counsel, defendant had the right to choose which defense to present.[3] Defendant relies upon *Weaver v Massachusetts*, ___ US ___, ___; 137 S Ct 1899, 1908; 198 L Ed 2d 420 (2017), in which the Court stated that a defendant's right to conduct his or her own defense is "based on the

---

[3] We again note that at the evidentiary hearing in this case, defense counsel testified that before the second trial, he and defendant discussed the defense at length and agreed that self-defense was the best strategy.

fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty," citing *Faretta v California*, 422 US 806, 834; 95 S Ct 2525; 45 L Ed 2d 562 (1975) (discussing a defendant's right to self-representation). In this case, however, defendant did not seek to represent himself but instead availed himself of his right to counsel. With the benefit of counsel comes the benefit, but also the stricture, of counsel's decision making. Our Supreme Court has explained that

> Every criminal defense attorney must make strategic and tactical decisions that affect the defense undertaken at trial. Most criminal defense attorneys have a variety of options from which to choose that affect, if not determine, how the jury understands and comprehends the case. Many of these options in a particular case may be contradictory, confusing, incredible, or simply poor. The role of defense counsel is to choose the best defense for the defendant under the circumstances. . . . [U]nless the attorney abandons a defense that had a reasonable probability of affecting the jury verdict, the attorney may choose the best defense. Defense counsel must be afforded "broad discretion" in the handling of cases, which often results in "taking the calculated risks which still do sometimes, at least, pluck legal victory out of legal defeat." [*People v Pickens*, 446 Mich 298, 324-325; 521 NW2d 797 (1994) (citation omitted).]

Defendant also relies on *McCoy v Louisiana*, ___ US ___; 138 S Ct 1500, 1508; 200 L Ed 2d 821 (2018), in which the Court stated that "[a]utonomy to decide that the objective of the defense is to assert innocence" is reserved for a defendant. In that case, the Court concluded that it was error for the defendant's trial counsel to disregard the defendant's desire to maintain his innocence rather than to concede guilt in an attempt to eliminate the possibility of a death penalty sentence. *Id*. at 1510-1511. Regardless of whether *McCoy* gives the defendant the ultimate decision-making authority on defense strategy, in this case the trial court determined that defendant agreed to the strategy employed at trial by his counsel. Both defendant and his trial counsel testified at a *Ginther*[4] hearing. The trial court made a factual finding that defendant and his trial counsel discussed the possible defenses, that counsel recommended employing a self-defense theory at trial, and that "defendant never voiced any objection to that defense and in doing so [defendant] agreed to the defense that [counsel] was recommending." Given this finding, defendant has not presented a factual basis to conclude that counsel relied on a defense that defendant rejected, or that defendant insisted that counsel employ the same strategy as used in his first trial. This factfinding places the ultimate decision concerning the defense in the hands of defendant.

---

[4] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

We conclude that defendant has not demonstrated that defense counsel at trial failed to provide effective assistance, and that the trial court did not abuse its discretion by denying defendant's motion for new trial.

Affirmed.

/s/ Michael F. Gadola
/s/ Cynthia Diane Stephens
/s/ Douglas B. Shapiro